May it please the court, can I proceed? May it please the court, my name is Hugh Wade, and I'm here today with my partner, Marion Kelly, representing Johnson Construction, Morris Johnson Jr., DBA, Johnson Construction. I first appeared before this court in 1962, and of course had to travel to San Francisco as a very young lawyer in order to make that appearance. Since that time, I have not made so many appearances before the court that I've become jaded. It is still very much a privilege in my mind to address you here today. Despite the privilege, you may have discerned that it is my client's position that he should not be here today, that I should not be here today. And I think that's manifestly true. We're here today because I failed to object to the initial petition for removal. It is apparent, I think conceded by everyone, that the initial petition was insufficient as a matter of law. I didn't make that motion. I didn't know that it was insufficient at the time. I knew that Mr. Sudaley, who made the petition, would not have made it if he didn't believe that it was appropriate. And I was not in awe of Mr. Sudaley, but I did, frankly, after a very limited review, pass on the initial period for making the objection. As it happens, I think that neither Mr. Sudaley nor I were familiar with what was going on in the federal courts concerning the citizenship of LLCs for purposes of diversity of I think it's apparent from the record that both of us assumed that they would be treated as corporations. And on that basis, it appeared to me that the affirmations in the petition were sufficient. As the case went on, I became aware of the Cardin decision and the lower court decisions relating to LLCs. And, of course, I was frustrated by the decision of the district court on the motion for summary judgment. And I made a motion to remand. Help me out. Why is the citizenship of so many of the people on the other side the last citizenship? Why is the, I think, these corporations, certainly the corporations, CP, Anchorage, Inc., sole purpose is the ownership and management of the, and in fact, I think it is probable that the sole, that the only business of the plaintiff, of the defendant corporation, or defendant limited partnership is the ownership of the Marriott Hotel in Anchorage. But my question is not so much what the business is, it's what the citizenship is. And why is their citizenship Alaska citizenship? Because their principal place of business is Anchorage, Alaska. Do we treat them as a corporation or are LLCs treated as more like associations? Well, in this case, the owner is a limited partnership consisting of two LLCs, and in both LLCs, one of the members, in the first one, both of the, two of the members are corporations. And the third member is a trust of a family, which I believe is an Anchorage family, but the trust is in the Bank of America, I believe. So, in the briefing, both parties failed to cite what has become a cornerstone case on these issues. The case matter of Roche vs. Lincoln Property Company at 373 Bed 3rd 610, a 2004 case, which is currently penned as a Fourth Circuit case, and the Supreme Court has accepted certiorari on that case. It, at least in the Fourth Circuit, it fixes the responsibilities of the court faced with the petition of the nature which I filed an objection to, or a petition for remand. And holds clearly that the burden of establishing diversity remains with the party seeking, which is sought removal. Okay, you can help me here. We've got, Columbia has two partners, right? Two limited, I mean, yes, a limited and a general partner. And they're both LLCs, C.P. Anchorage and C.S. Holdings? Yes. Assume for the moment that we treat C.P. Anchorage and C.S. Holdings as associations rather than corporations for purposes of diversity citizenship. I don't think we have a holding directly on point in this circuit on that, but that would be, I think, the general law in other circuits. So we look to the partners in C.P. Anchorage and we look to the partners in C.S.C. Holdings. Are any of those partners Alaska citizens, and if so, why? I don't know the answer to that, and the record is unclear about that, and the judge made no inquiry concerning that. But if you don't know the answer to that, you're just saying then there's a failure of proof, and therefore? Yes, Your Honor, I think the... You have no inkling as to their citizenship? I think they're all, I think that the corporation is a, clearly, is a, I don't know who the parties are. I do not know who the parties are, they've never been disclosed. You're assuming that they're shareholders in those corporations? There are going to be some owners in those LLCs, is that correct? Well, the LLC is actually owned by two corporations and a trust. There are no individual owners, members of the LLC. Now you say the LLC, there are a couple of them, which LLC? The first LLC, and the second LLC is a corporation and a, is a corporation and a trust. Now you say the first and the second, I can lose myself. Refer to them by name, which one are you talking about? I've got the chart, which appears in the e-mail. The first entity is CSC Holdings LLC, it appears in page 38 of the, of the, pardon me, beginning of page 37. Of the appellee's brief. The, what I referred to a moment ago as the first LLC is CP Anchorage GPLLC. Okay, I'm now on page 37 and 38. Okay, so we've got, Columbia has two partners, one of them is CSC Holdings and the other one is CP Anchorage. Right, okay. Right. Okay. And, and, and CP Anchorage has Columbia Sussex Corporation and Anchorage GP Inc., two corporations, and the Jung Family Trust. Okay. Okay. Now, the, the second LLC is called CSC Holdings Inc. Yeah. It has Columbia Sussex Corporation and the Jung Family Trust. Yeah, and I'm still looking for an Alaska citizen. Anchorage GP Inc. That's an Alaska citizen? It's, it's only business. But, but what if we follow the law that I think is the dominant law in the other circuits and says that, which would require us for an LLC to look for purposes of citizenship to the partners or owners of the LLC rather than to any independent citizenship of the LLC itself? That's correct, but the, but the, the cases that, that I have reviewed, and I have attempted to review all of the cases dealing with the LLC question, all deal with LLCs which, which consist of individual persons who are members. Yes. This, this LLC has no individual person which is a member, and its, and its sole business is the, is the hotel, in the Marriott Hotel. Now, to, to treat it, and, and, and that's what, what I, why I found the, the Roche case so compelling and so interesting. Because it focuses on what the business of, really is. And it holds that this business, which is being, the defendant in that case, which, which is the owner of extensive property in Virginia, cannot, simply by saying that it's a Texas corporation, and a, with a principal place of business in Texas, insist on diversity of citizenship. Okay, so the argument comes down to the argument that Anchorage, GP, we should treat it as if it were an ordinary corporation, and look to its principal place of business as a state of its citizenship, which would be the case, of course, if it were an ordinary corporation. So, so you, so you stand or fall on that argument? I, I, I think, I, I, I don't stand or fall on that, because it's my, my impression that there is a whole body of law concerning entities which are formed to own corporations. And, and the holdings, and those, and I cited the Minnesota case, and that, that hold that where, where an entity is formed, regardless of, of its, of its, of the format in which it's formed. What, and, and the sole business of, of that entity is to own a hotel in, in this case, Anchorage. That it is a, for diversity purposes, it is a citizen of that location. And you're arguing... And that's clearly the holding in Roche. And you're arguing that the cases that hold that the citizenship of an LLC is determined by the owners of the LLC, that this case, those cases involve individual owners, and this case, because it involves corporate owners or institutional owners, it doesn't come under that general law. I think, I think you have to apply the rule with some, with some... I'm not sure I understood the argument. That's, yeah, that's essentially the argument. Do you have a case that says that? No. I, I, nor, nor any case that deals with it either way. Okay. Except, except, by the way, for Roche, which seems to say that the ownership of the property in Virginia creates a, a presumption, and that the, and that the party removing has, had not presented sufficient evidence to... Assuming, for the purposes of the time remaining, that we're properly here, what's your best shot at arguing that the statute of limitations does not apply? The contract between the parties, Your Honor, as is described in the Johnson affidavit. And I did not mean, I, it seemed to me that the court had its first deal with being, with the jurisdictional matter, but I did not mean by starting on that to suggest in any way that I thought that the part, that the statute of limitations is wrong. The, the affidavit, the affidavit of, the only evidence before this court concerning the contract is the affidavit of Johnson. He's the only person who, and, and by the way, his, his records, his affidavit, it is clear from his affid, and, and must be presumed to be true from, on the basis of his affidavit, that the property, that the, that there was a single contract, that a part of that contract provided that payment would be made at the conclusion of the project. That the project was not completed until after April of 2000, and, of 2000, and that, and that, and therefore the time for payment, the time when Johnson was entitled to payment was, was, was sometime after February 13th, 2000, the last day he worked, actually, February 24th, 2000, and this action was filed within three years of the date when he first became entitled to payment. So, the, the, where there's a, where's the contract? And in your, in your view, what triggers the time that he's first entitled to payment, and then the statute starts to run? The contract, he, he, he testified that he had agreed with the, in, in, in squaring his affidavit, that, that, as a, that a part of the, the agreement was that he would be paid at the conclusion of the project. And the project means? The project meaning the construction of the hotel, or perhaps the last day that he worked on the project, either one, under either interpretation. And in, in your view, when you say the last day he worked on the, on the project, that includes that cleanup project? Yes, and, and, and as I explained in my, my brief, the inference that that project differed in scope or, or, or nature from the work that he performed earlier is simply not true. He testified that he, the, the evidence clearly shows that he used that same equipment early on in the project. That he, and, and that he provided labor throughout the project. And, and, and that his original quote to Columbia included a, a, a labor quotation. Would you like to save the rest of your time? Thank you. Please record. My name is Michael Grisham. I'm here representing Columbia Properties Anchorage LP. And I very much appreciate the opportunity to be here, and I also thank the court very much. And also, I phoned Mr. Wade for your indulgence in allowing me to postpone this argument one day, which was greatly appreciated. Under the facts, as Mr. Johnson has alleged them, he failed to send out invoices for his services until three and a half years after he first provided services to Columbia. He says in his affidavit that he first performed work at the Anchorage Marriott Construction Project on August 28, 1998. And there's no dispute that he did, he sent no invoice to Columbia until February 13, 2002. That is the reason that we're here now. Are you disputing that he actually performed the work? Um, that portion of the record has never been developed, Your Honor. And we're not accepting that he did this work that he specifies, that this $100,000 plus, uh, bill that he sent out. Are you disputing that he did any work at all? Um, we are not disputing that he did some work. And you just don't want to pay for it? Um, we certainly don't want to pay for, uh, um, yeah, we don't want to pay for it, yes. Does your mother know you're making this argument? My mother is all in favor of me making this argument, because one thing that she's always taught me is that, uh, is, uh, is, uh... That you don't have to pay your bills if somebody's late in sending the bill. No, that I'd be, I'd better be timely, and I'd better live up to my responsibility. Somebody isn't timely, they've done some work, and they're not timely, she says, uh, you don't have to pay. Well, no, my mom doesn't say that very much at all, in fact, we don't tell her that either. Um, yes. The law says that, and what's the law? That's what the law says, thank you very much, Your Honor, and, uh, I'm glad to get my answer out of this. And I confess it, we're here to apply the law. Thank you very much. Um, what the law says is that... We'll call home tonight. In fact, she just left, so... Um, this case is a textbook example of why the statute of limitations exists, Your Honor. We're talking about, uh, I've talked about three and a half years until he's even sent out an invoice. August 1998, he hadn't filed the lawsuit until 2003. We're talking about five years after he started working. Um, I'm an attorney, I send out monthly bills. Um, I don't know how many of, uh, members of this panel have, uh, been in private practice, but I'm sure that you can imagine what a client would say if I delayed sending out my own bills for three and a half years. Um, and they likely wouldn't want to pay them either, just for that fact. And this case is a textbook example of why the statute of limitations exists. Delays happen, it's true, but there has to be a limit. There has to be a set of absolute outer boundaries of what is acceptable delay in business practices There has to be an incentive, a strong incentive, for people to manage their business affairs in a reasonably prompt manner. Well, when the first, there was the first sort of an accounting sent out, I don't know what you call it. In August of 1999, Mr. Johnson alleges that he sent out some sort of daily logs. Okay, is, does that log actually exist? Um, we have seen a copy of what he purports to be these daily logs. Columbia has, uh, uh, Mr. Donovan and, uh, uh, Mr. King of Columbia have stated that they did not, uh, ever see these logs, and Columbia has no record of these logs in its own possession. Was that within the statute of limitations? Um, the sending of the logs, yes, Your Honor, that probably was within the statute of limitations because it was on the schedule. And then I want to check this one thing, whether it's real or not. I couldn't find any in the record that it was any attempt to pay anything. In other words, we never got to that point in, in the record of this case. And we never got to that point in the record of this case. None of this has been developed. And, um, uh, whether or not this is disputed, uh, I, I can assure you, I assure the Court that there will be disputes regarding, uh, the specifics of Mr. Johnson's allegations regarding what specific work he did, how much, uh, time it took, et cetera, et cetera, et cetera. You've seen the bills in the record. They're expensive. Um, they involve a lot of, uh, a lot of detail. Um, and, um, as it was established in, uh, Mr. King's, uh, testimony and in his letter that he sent to Mr. Johnson when he first sent this 2002 invoice, he, uh, the, uh, proof of what work was done and whether it was acceptable or not was entirely lacking, for instance. If you, has there been any attempt to mediate this case or settle this case? Um, the Ninth Circuit has insisted that we attempt so, and the, uh, District Court has insisted as well. Yes, there have been attempts. And have you been through the mediation process? Yes, we have, Your Honor. Yes. Um, the statute of limitations, which is the law we're talking about here, it recognizes businesses' legitimate need to control and manage their votes and their cash flow, especially in the context of a construction project that is central. We're talking about a fast-moving project in the context where appropriate management of cash flow, having the money to pay Peter while Paul is working, um, is a very significant thing. It means the difference between a successful project and bankruptcy in many instances. A person who fails to send out his invoices, fails to even tell you what's going on for three and a half years. Gives you an interest-free loan for three and a half years. You can look at it that way, Your Honor, or he fouls up your bookkeeping for three and a half years. We should all have such fouling up. That might be, that might be so, Your Honor. But what we're talking about here is not, uh, we can revisit the policy issues behind the statute of limitations, but that's really a decision for the Alaska legislature. And the court could take a, should take notice of the fact that the statute of limitations for Alaska and for contracts was recently reduced from six years to three years. Um, the legislature believing that, um, that three years was the more appropriate period of time. That's, yes, there is that absolute limit, and yes, if somebody waits far too long, then yes, you get their work for free because they have blown it. They have waited too long. And the policy behind this is, it's twofold. First off, it recognizes that businesses need to move on from projects. They need to close their books. They need to stop waiting for everything to be cleared up because it costs money. And it costs, you have to have, uh, you have to have your books open. You have to have a project manager know where things are. You have to have storage of all the records. Um, these things are difficult to manage. And what the Alaska legislature has said is that at three years, we're closing it off. That's the end. Get your stuff done by then or forget it. Is it harsh? Yes, a lot of cases have said it's harsh. But is your failure to apply it in this case also harsh? Yes, it is. Because we're here, not due to any delay by Columbia Sussex, but due to Mr. Johnson's delay. And what's happened in these now seven years since this work was started? Well, Mr. King, uh, the latter project manager for Columbia, uh, Properties has moved on. Mr. Miller, who was the additional project manager for the Anchorage Marriott, has moved on. Most, if not all, of the employees who worked or were, uh, involved in this project have moved on. The records are not centrally located anymore. They would have to be reconstructed at great cost. And all of this because Mr. Johnson waited for three and a half years to send out an invoice. This claim is stale. Now, let me ask you a question so I make sure I understand this. There were some, some communications within the three-year statute of limitations. There were some communications, yes. Okay. That didn't result in any agreement or payment? No. Was there ever a demand for a payment during that three-year period? No, there was not. The record does not display any demand for, uh, any specific demand for payment. No specific demand. In other words, you've got these logs, so there never was a demand, I want $90,000. If I go through the record, I can't find any demand during that three-year period. That's correct, Your Honor. In the record, what we have are these Mr. Johnson's allegations, which are disputed, but should be accepted for purchase and return, that he sent these logs, but the logs were not, uh, he doesn't allege and the logs themselves don't show anything specific. Were the logs priced out or just a description of work? My understanding of them at the present time is that they were mostly a description of work done, although I can't speak with authority to that right now, Your Honor. Is it safe to characterize the fact that there was some sort of loose oral agreement? There was nothing written, I take it. The only written agreement in the record is the one that's been cited before it in the excerpts. It did not encompass all of the work that Mr. Johnson purports to have done, and that with respect to at least the ship and creek yard cleanup, Columbia admits that he did. Is there any of, I don't know where this is going, but is there any of the work that he may or may not have done outside of the statute of limitations at this point that was preserved by the lawsuit? What was, our allegation was that there were two, and which the district court accepted, there were two separate contracts, one dealing with, or at least two separate contracts, pardon me, one that dealt with crane work, one set of contracts that dealt with crane work, and another contract that dealt with the ship creek yard cleanup. That was preserved. Yeah, cleanup was preserved, the ship crane worked. It's just the crane. Okay, that was my understanding, too. And one of his arguments is, of course, that it's all one project. That's correct, Your Honor. Which the district court did not agree with. The district court did not agree with that for very clear legal reasons, and I'd like to, Mr. Wade raised a point with respect to that that I'd like to address, which was that he said that his logs show that his logs were, quote, the only evidence regarding the contract between the parties, and that these logs demonstrate that manual labor and hauling work was done. First off, this is a vermin, or this was not raised before the district court. It first showed up in a reply brief on appeal, and it would be fundamentally unfair to Judge Weisslein to criticize his decision at this point based on an allegation that was never specifically made before him. Again, these logs were not produced to Columbia to Sussex at the time the work was supposedly done, and what Mr. Wade was talking about here was with respect to the agreements that were made for labor were what are known as wet rates for operating construction equipment, which includes the operator, and in some cases an oiler, who keeps the equipment clean and operating while the construction crane moves. Those are the labor rates that the record reflects were actually agreed upon. So, that is the rental of the crane that came as a complete package, not just the crane but the people necessary to actually operate it. That's the labor that he was talking about. Now, that is very different from what happened at Ship Creek. Now, Andy King, who did submit testimony into the record in form of two affidavits, stated that he was the second project manager for Columbia to Sussex who came up here and worked on this project, and he testified that he personally negotiated all material terms and conditions for the Ship Creek project with Mr. Johnson personally. So, there is at least a dispute as to that, and there's certainly not just Mr. Johnson's testimony in that regard. There's also the testimony of Andy King, and we can't rely solely on Mr. Johnson's take on this evidence. We have to look at the whole of the record. Now, looking at Mr. Johnson's affidavit and what he actually says, he does not state that he negotiated rates for manual labor for clearing up a construction yard, which is very different from having an oiler or somebody who is operating a crane. These are people who are walking around picking up loose pieces of construction equipment and tossing it into a truck. He doesn't allege that he agreed upon rates for that service, which was essential to the Ship Creek project. He does not allege that he arranged for the rental of any particular type of truck or the rate for the rental of that truck, which was, again, central to the Ship Creek cleanup. He didn't arrange for the manual labor rates for the driver of a truck, which was central to the Ship Creek project. He never specifically alleges those things. What he does specifically allege is that they agreed on what he called went rates, labor plus equipment for the operation of these various types of crane. So when he's talking about a single contract here, he's talking about just going to the Morris Johnson store and saying, hey, I want this thing or that thing or the other thing without any specified agreement with respect to what service was going to be provided and at what rates. That's not a contract. That's never been a contract. You have to have specificity with respect to the material terms of the contract or you've got no agreement. You're getting into the mines. There can't be a single contract here under Johnson's own allegations. What would have happened if you received the bills prior to the three years? You still would have to file a lawsuit within the three years, right? If you didn't pay them, you indicated in your brief that after three and a half years, you received some invoices. Well, if those invoices had been received prior to the three-year statute of limitations and they hadn't filed a lawsuit because you hadn't paid, would that change under Alaska law? Is it kind of stated or something? We're not claiming that the invoices are legally material in themselves or that they have any specific agreement. It didn't happen. The invoices came in after the three and a half years. Well, the three and a half years I'm referring to with respect to invoices are after he started work in August of 1998. It's quite possible that these invoices were sent within the statutory limitations period for filing a lawsuit. The issue that I write, yeah, I don't want to get back to it. That does not create any different cause of action under, which may or may not be a suit upon, but under Alaska law? No, no. There's no agreement that it does, Your Honor. And I raise the point regarding the invoices not for their specific legal significance but to demonstrate a fact even in Mr. Johnson's own allegations that demonstrate his failure to take any reasonable and timely actions, one, to put Columbia on notice of what he was claiming he was due, two, to protect his own rights, and three, to start the justice process moving so that his claim did not become stale and so that we're not faced with him trying to reconstruct seven years after the fact whether he specifically did work or not. And had he sent those invoices in a timely fashion, I think he would have gotten a letter like the one that Mr. King sent saying- Well, if you ever get around to the attorney's fee question, the trial judge seemed to think that the equities, he'd done enough work so he shouldn't have to pay the other side's attorney's fees. Well- They're losing a statute of limitations case. Judge Weisslein's decision was not eminently clear on why he decided to deny his attorney's fees. He might have felt sorry for Mr. Johnson. He referred to the equities and, you know, as the Court has clearly indicated, the judges generally hold the statute of limitations in disfavor, and Judge Weisslein might have recognized this as a somewhat harsh remedy, although necessary in terms to where he believed he did have equitable authority to deny the attorney's fees. Our position, though, is that we were forced to litigate a stale claim anyway, and here we are now, again, seven years after the fact, litigating this stale claim. Would the Court like me to address briefly the issues regarding the jurisdictional arguments that have been raised? I'm not entirely clear on the point. Okay, thank you. So, turning back to the central issue of the contract, then, what we're talking about here is the end effect of unreasonable delay, and the statute of limitations is a harsh remedy, but that's the legislature's call. They've said it. Three years and you're out. It's plenty of time. Mr. Johnson did not take the reasonable steps that the law requires him to take to put Columbia on notice of what his claims are so that they can be disputed, and to protect his own rights, and to allow the courts to effectively administer justice. Now we're faced with a situation if the trial court's decision is overturned where we're going to have to go back to the trial courts and recreate, seven years after the fact, an entire set of factual circumstances without the benefit of having the people who actually worked on the project there to do it. That's extremely prejudicial to Columbia Sussex. It's extremely costly to Congress. You're overstating now. They're not here now, but they're not dead. I don't know where they are, Your Honor. I know they're not working for Columbia Sussex. I don't know if they would be willing to come back, and Mr. Miller was very difficult to contact. We were not able to arrange any testimony from him at all. So, whether they're dead or not, if we can arrange for them to be here, they're not subject to Alaska subpoena power. They're not in the state of Alaska, and we don't know if they can be here or not. And that's why the statute of limitations exists. Thank you very much. The contract between the parties, as it's described in Mr. Johnson's affidavit, the only testimony concerning the agreement, it is clear that the parties agreed that there would be no invoices until the conclusion of the project. What do you mean by the parties? It's clear. Clear meaning that Mr. Johnson has sworn, under oath, that that was the agreement that he made with Mr. Miller, and there is no contrary evidence in the record whatsoever. And all the evidence, I mean, all this talk about that they really wanted to keep track of the project as it was going, they made no effort. They made no effort. There's not a lick of evidence in the entire record that they ever objected to the lack of periodic invoice. And it's not unique in the construction industry or in any other business. It's not unique to have an agreement that you'll be paid at the conclusion of the task and upon demand. And the evidence in this case, the evidence which must be believed for the purposes of the motion for summary judgment, is that that was the agreement which was made by the parties in this case. And the affidavit, I suppose it fails for all of the reasons that affidavits fail, but it's relatively clear, I submit, and I suggest that the sequence of events with regard to time, the submission of the, and all of those documents are in. I think we've got the factual narrative and sequence pretty well in hand. Good. Thank you very much. You're a little over time. The case of Johnson v. Columbia Properties Anchorage is now submitted for decision. Thank you both for your arguments. Next and last case on the argument calendar today, I was about to say this morning, but that's long past, Alaska Trojan Partnership v. Secretary of Commerce. We'll take five minutes before this next case. All rise. This court stands in recess for five minutes. Five minutes. Five minutes. Five minutes. Five minutes. Five minutes. Five minutes. Five minutes.  Five minutes. Five minutes.  Five minutes. Five minutes. Five minutes. Five minutes. Five minutes. Five minutes. It's a bit of a mess. It's a bit of a mess. It's a bit of a mess. It's a bit of a mess. All right.  All right. Well, thank you for your patience. The last case on our calendar today, in fact, for the week, Alaska Trojan Partnership v. Gutierrez, Secretary of Commerce. May it please the court. My name is Mike Stanley. I'm here today representing Alaska Trojan Partnership. With me today in the courtroom are our principals of the partnership, Ted Painter and David Dupree. They've traveled up here to be present for this, and we appreciate the opportunity and the privilege of appearing before you. Today I'm going to frame my remarks around this illustrative exhibit. This is actually just a recreation of something that's in our opening brief at page 27. And also, at the clerk's recommendation, I've handed a little handout in for you to take a look at. Yeah, on the closing counsel, I assume, you've got a handout as well. And what this shows, this shows what the official license limitation program, and I'll use the word LLP for that, this shows what the LLP record would look like if it were corrected to show that the Alaska Trojan harvested fish in the second state statistical area that were delivered on November 11, 1994. On your handout, at the bottom of your handout, I've actually did a little cut and paste of what the record actually shows. And that's from excerpt of record page 131. And the only real significance there is to note that in the existing record, there's one line of harvest information, whereas what we're suggesting is that the record needed to be corrected to show two lines of harvest information. And there's not really any dispute about that. The hearing officer found that the partnership had presented substantial evidence that the crab were taken in two different areas, half in each area. Two distinct times. Well, yes. And the government, in fact, for purposes of this brief, is answering brief at page 11, footnote 6, says they don't dispute this. So I'm just trying to suggest that this is what the record should look like. It should show that there was crab taken in this area and in this area. And the question in this appeal then is, is this two harvests or is this one harvest? Now, the LLP regulations define a documented harvest as a lawful harvest that was filed in compliance with federal and state commercial fishing regulations in effect at the time of harvesting. We submit that that definition is not ambiguous and that it plainly applies to each one of these lines of harvest information for several reasons. First, as indicated when we had the hearing with NIPS, NIPS presumes that each of these lines of harvest information indicates a lawful harvest that was recorded in compliance with state regulations. In other words, that's the very definition that we're talking about here. Second, and that's an excerpt of Record 186, 187 through 190. Second, the administrator of the Restricted Access Management Division, which we often refer to as RAM, Mr. Smith, acknowledged that each of these lines does, in fact, document a harvest in a common sense sort of way. In other words, if you think about a lawful harvest recorded in compliance, those are not complicated terms. Those are pretty straightforward terms that have a common sense understanding. And he said, yeah, each of these does document a harvest, but it's not a, quote, unquote, documented harvest. Third, each of these lines of harvest information, in our view, represents a complete and discrete event. So the harvest of crab, the landing of the crab, and the reporting on a state of Alaska fish ticket. And I think, moreover, what's important to understand in this case is that these harvests were separated in time and space. As recounted by the hearing officer, and I refer you specifically to Excerpt of Record 209-210, the harvest that occurred in this area, 795-200, was primarily in the first week of November of 1994. And after that week, on about November 8th, and this is reflected in their log book, which is in the record at 104, they picked up, they left the area, they went over to Kiska Island, tried fishing there, came back to the area, and went fishing in this second state area. Let me ask you this. Under the government's theory of what constitutes a harvest, would it be a harvest if your clients had harvested crab of this, the brown king, in a certain area, gone in, offloaded it, gotten a fish ticket, gone right back out to exactly the same area, got another boatload of crab, brought that back in and landing. Would those be two harvests under the government's definition? Yes. Under the government's definition, there would be two fish tickets, and therefore, those would be two harvests. So, for purposes of harvest, it doesn't matter that they might have been taken from the same place. That's correct. If the fish ticket doesn't matter. Here, they were taken from two different places, but for purposes of the definition of harvest, that's not essential. That's not essential, but it is essential for what I think is the central point of our argument, which is that because they were taken in two different places... That doesn't help you show that they were really distinct events. Well, not only that, but it also shows that when they're reported, they're required by state law to be reported as separate harvests in a separate statistical area. And once they're reported, they're put into the state fish ticket file, and they acquire a separate identity as a harvest. The state fish ticket file recognizes them as separate harvests, and then that was carried over into the individual record where they're recognized as separate harvests. So, the fact that they're in different areas is important because that is what makes them have a separate identity. Help me understand what's going on here. The qualifying period was 1994. Right. And the policy change in the definition of harvest was 1999, wasn't it? Right. When did the fishermen discover the value, the unique value of the third ticket? In June, the LLP program was adopted in June of 1995, and that is when they said you had to have three documented harvests. Actually, the council, when they used the term, they said we need three landings, and we talked about that in our briefing. What did they understand by that term? In 1999, when RAM was getting ready to apply the program, that's when they came up with this, well, somebody asked a question, I guess we'll just, you know, one fish ticket equals one documented harvest, and that's that short memo that's in the record at page 43. But to follow up on Jed Goodwin's question, when they're actually out there taking these crabs, they're unaware of the consequence that will be later attached to how many and where and offloadings and so on. They're just out there fishing. That's correct. Okay. And to kind of illustrate the point, I think we've shown in the record, this is actually up to record 198 through about 206, when we made a claim under the unavoidable circumstances regulation. We said that actually they had planned to make a delivery in mid-November. They had actually made plans with the catcher processors out there, but they couldn't. And so, well, he asked the question, well, what would the record look like if they had done that? Well, instead of November 24th, it would be about when they left to go to Kisco on the 8th. And obviously, you'd have to have a different fish ticket number. So, you know, so you change a couple of the delivery details and now you have two harvests. Even NIMS would say, yeah, that's the third fish ticket. That's good enough. Here's part of the way I see this case. Your definition of harvest seems to me a perfectly sensible definition of harvest. Yet, the agency has some scope at defining a regulatory or statutory term. Here, a regulatory term. And I'm not sure your definition is the only available or reasonable definition of harvest. That doesn't necessarily seem to be fatal to your case. My problem is, and the government might as well hear my tentative thoughts on the matter right now, I'm tempted to see this as the government having chosen the only definition for harvest that's unavailable to them. Because their definition of harvest is it is synonymous with landings. And the regulatory chain says we're deliberately getting away from landings. So, I'm not sure I need to get to your point of saying this has to be the definition of harvest, the one you want, although it's a perfectly plausible one. I think the government may be free to adopt some slightly different definition of harvest. But my problem is the one definition they chose, I think, is unavailable. And I think that is a central part of what we're trying to say, is that they are focusing on delivery rather than harvest. In fact, if you think about it, you know, these details in here, the fish tickets, the date they were delivered, those are delivery details. Those have to do with the landing. That doesn't have anything to do with the harvest. You know, the harvest details are over here. And what's interesting is that, like I say, you can change these dates and you've still got two separate harvests. How many other people were getting permits under this system? And if we go with your argument, would that open up all the rest of the permits that were issued? There were, they projected, the council projected that about 47 vessels, I believe, and this is in the record and I can give you a specific size, about 47 vessels wouldn't qualify. Over a period of time, about 30 actually did qualify. Now, there were some other circumstances that came into play. But as far as who would qualify if you were to rule in our favor, only the Alaska Trojan Partnership would qualify for several reasons. I mean, one is that they're the only party in this case, so any relief you grant is only going to flow to them. Two, it's not clear that there are other people who are in a similar factual situation. The government kind of speculates, but there's not been any showing. And in fact, I just know that it's probably unlikely. But more importantly, the deadline for making those claims was 1999. And this takes a pretty hard line on reopening the record to entertain claims at this length. In fact, after this court decided in Ward's Cove that they had misinterpreted the IFQ regulations, you know, they actually, there was potentially a pool of people who had been denied sablefish allocation who could have benefited. Well, and this didn't reopen that application period and entertain a bunch of claims. The only people who benefited from the Ward's Cove decision was Ward's Cove itself. My other concern is that the council, the North Pacific Fishery Management Council, started all this in accordance with their duties under the law to manage the fisheries. And apparently, from what I can read, I may be wrong on this, but they used the three landings as their recommendation apparently in their review. Now, I may be wrong. Who came up with that? But it seems to fit into how they're going to limit boats and how they're going to limit the take. And so if the council reviewed it, the commission and the regulatory body reviewed it, we're not going to go back and use our expertise to give you two fish tickets based upon this complicated conservation thing. I'm having a hard time with that. In other words, these folks went through this, and apparently they're trying to do something relative to conservation of the brown crab. But I understand where you're coming from. But apparently we're going to make some sort of determination for this boat and this particular fish ticket, in spite of all the other work that apparently studies have been done, I guess. I have two responses to that. First, we have no dispute with the three harvest requirement. The regulations say three documented harvests. We're not challenging that. What we're challenging is the interpretation that RAM adopted kind of rather casually in June of 1999 when they came out with that little e-mail. So we're not challenging what the council said. Also, if you look at the reason that the council gave for that three harvest requirement, and this is set forth at the excerpt of record page 30 of 63 Federal Register 52645, the council says we're going to require three harvests for brown crab and tanner crab because we don't want people qualifying on the basis of incidental harvests, meaning they're out fishing for one species and they happen to catch a few of the brown crab and sell them and therefore get a ticket. So we don't want that, and we want to make sure that people are going to remain in the fishery. This vessel, that previous summer, had invested three-quarters of a million dollars. I think that they were fully intended to stay in the fishery, and in fact they've been in this fishery every year since that time. So it's not inconsistent with the council's intent. In fact, it would be our view that letting this vessel get this endorsement or awarding this endorsement to this vessel is exactly consistent with what the council's intent was. Except for the mechanics that have happened in the state system where they have the fish tickets and that sort of thing, and except for the fact that on that given day you might have landed two of them or you might have delivered, in fact, two fish tickets except for other circumstances. I guess the way I would say it is... No, no, I want to go there because you're asking us to equate the two areas that are put on one fish ticket as two tickets. That's the state system. That's beyond us. No, it has two harvests. Two harvests. Two harvests reported on one ticket. All right. And so you want us to separate the ticket. Now that was set up by the state. You pulled your boat in and got the thing done. Nobody did this except at your boat. Now we're trying to figure out how to get to where you are. Is it the fact that you were prevented from bringing in two or is it the fact that the law, the regulation, and interpretation is wrong? It's the fact that the interpretation that RAM applied, their rule, their one fish ticket equals one documented harvest rule, we believe is not only contrary to the plain meaning of the term, of the definition of documented harvest, but it's also inconsistent with the intent of the LLP. That's our point. And I guess one way to try to drive that point home is to say it this way. The council never had this rule before. This is something, again, RAM came up with in that period of time when they were trying to figure out how to start implementing this thing. There was somebody who raised a question, they had this little conversation, and they said, okay, well, this is the way we'll do it. Here it is. And this is not anything that the council ever looked at. This is not a council rule. This is not something that was promulgated according to the Magnuson Act rulemaking. It doesn't have the force of law. And for those very reasons, that's why we say that the RAM rule is not entitled to Chevron-style deference. If you look at Christensen v. Harris County and the USD Meat Corp., we submit that that rule is entitled to fairly little deference. It's just, again, RAM kind of came out and said this is the way we're going to do it, no analysis, no rationale. There was a rulemaking going on at that time. On August 6, 1999, they published the rule by which they defined the official LLP record. It would have been a very easy thing for them, I guess, to do a rulemaking at that time, which could have encapsulated their rule. They didn't. They just said, oh, here it is. This is the way we're going to do it. Anyway, I'd like to reserve the balance of my time. Good morning, Your Honors. My name is James Kilborn from the Department of Justice. And with me at the council table is Jonathan Pollard from the Regional NOAA General Counsel's Office in Juneau, Alaska. As a preliminary matter, I would like to make sure that the court is aware that we have submitted two supplemental citations of authority, one by way of a letter written to the court last week, a letter dated July 7. And that was sent to the court in San Francisco. And in that case or in that letter we cited to the court this court's recent decision in a case called Yakutak, Inc. v. Gutierrez, which was a challenge to a license limitation program similar to the license limitation program I issued here. The citation to that case was 407, Fed 3rd, 1054. And then this morning we provided an additional supplemental citation of authority to the court and to council. And this is to the Supreme Court's recent decision in a case called National Cable Telecommunications Association v. Brand X Internet Services, decided June 27, 2005. And the cite to that is 2005, Westlaw, 1498, 860. The issue in this case, or Alaska Trojan would have the issue in this case be whether its interpretation of the regulations is, it said that there is only one interpretation of the regulations, and that is consistent with... That's not necessarily their only argument. How about the question that I asked him that I'll now address to you, not whether their definition of harvest is the only available definition, but rather whether your definition is the one definition that's not available. The rationale for my question is the regulation explicitly moves away from landings to harvests. Fish tickets measure landings. And yet you define harvest by fish tickets, which measure landings. What the regulation says, or what the preamble explanation in the final rule at page 33 of the excerpts of record... Hang on a second. Okay, I'm on page 33. This is in the left-hand column, basically the first full paragraph under the heading Changes to the Final Rule. It says, definition for the term documented harvest is added to the final rule. The term documented harvest replaces legal landing throughout the final rule. The new term more accurately describes the activity necessary for eligibility. It says it more accurately describes the activity. Included in the proposed definition of legal landing was the activity of offloading. And this says offloading is not necessary for eligibility. That is correct. But what is necessary is that there be a documented harvest. And this regulation has defined documented harvest to mean a harvest recorded in compliance with federal or state law. Now, for the crab fishery, this is basically a state-managed fishery. So we look to state law to see what is required. And state law requires that the harvest be documented by issuance of a fish ticket. And the fish ticket... You're skipping a step. Let's see if we can establish this as a factual matter. The old definition of landing, the way you got landing was you offloaded. And when you offloaded, you got a fish ticket. Correct? Yes. And now you're saying the definition for the crab fishery purposes, not necessarily for ground fish, because I understand you've got a different way of going about it than a fish ticket. It's a different regulation. For the crab fishery, the way you document a harvest is you document the landing. Correct? And if you have one fish ticket, it doesn't matter that you might have fished in two different places, two different times, and done exactly as they've done. And, in fact, as I understand it in the hearing, there was a statement that, well, if he'd come in after the first batch of brown crab and, in fact, offloaded and got a fish ticket, that would be a separate harvest. Correct? That is correct. The change in this regulation from the term landing to documented harvest was intended to focus information on what NMFS wanted to record, have accurately recorded, was not where fish was landed. That is where it was offloaded. Because it didn't do NMFS good, really, to determine the point of offloading. What they wanted to know is where the fish was harvested. Well, I'm not sure that's the only reason for the change, because in the language that you're pointing me to, although I've not read the sentence yet, it's preceded by the word further. That is to say, that sounds like it's an additional reason, not the only. I agree. But there is another reason is that, you have to understand that this regulation applies to both the ground fish fishery and the crab fishery. This is a general regulation, so it is speaking to both of these fisheries. Am I right in understanding that as to ground fish, fish tickets are not necessary in the sense of you can fish for one species of ground fish for a while. You can then fish for another species of ground fish for a while. You can then offload those fish and get one fish ticket but have more than one harvest. Is that correct? That is correct. That would be correct for crab, though, as well. If the fish ticket showed that there were two different species of ground fish or two different species of crab that were harvested, even if they were harvested in the same federal endorsement area, if there were two different species involved, that would result in two documented harvests. When you're harvesting the same species, the fact that you don't come in after one batch has been brought up and then you go for another batch, the fact that you didn't come in and offload, that's fatal. I wouldn't say it's fatal. It results in one fish ticket. In this case, it's fatal. In this case, it does not result in two documented harvests for them, so they did not qualify. That's correct. What's the rationale? Does this have to do with the council's study on the preservation of the crab, limiting boats? In other words, you made what appears to be just an arbitrary decision. Different species, two tickets. Same species, one ticket. So what's the rationale to make that decision? The council was trying to – this is a fishery that is in need of management, and the council has taken a multi-step process and gone from a system that they described a moratorium process to this system that was adopted in 1998 called the Limited License Program, which was in essence intended to put a cap, a limit on the number of people fishing in the fishery. The number of boats out there. The number of boats out there to now where they have just put in place a new regulatory scheme involving a fishery quota permit scheme, which is an even more restrictive scheme. So this is a fishery that is in dramatic need of conservation regulation. For purposes of Chevron, what is the rationale then to treat this ticket as only one ticket? Chevron says, and the plaintiffs here rely primarily on cases interpreting agency interpretations of statutes. And under Chevron, the analysis for an agency interpretation of a statute is different from an agency's interpretation of its own regulations. The Chevron deference standards are stricter when a statutory interpretation is involved. But here we're talking about regulatory interpretation. And here the Supreme Court has recognized deference to an agency interpretation advocated in all kinds of circumstances. We cited in our brief our case, the AUER case from the Supreme Court decided in 1997 where the court deferred to an agency's interpretation of its regulations that was advanced for the first time in an amicus brief filed in the Supreme Court. And the court said that interpretation was reasonable and therefore it's binding. Even if there are other reasonable interpretations of the regulations. We also cited the Bowles v. Seminole Rock case. An older case, a pre-Chevron case, but has been cited as still good law where the agency set forth an interpretation of its regulations in an administrative bulletin issued contemporaneous with a regulation interpreting that regulation. And the Supreme Court deferred to that interpretation because it found it reasonable. And you want comparable deference for an internal email? This isn't just an internal email. The appeal officer decision, administrative decision on this is very instructive in terms of how this interpretation was developed. And I would cite you to this at Excerpts of Record 216 to 220 basically where here there were three written submissions in the agency administrative process. In this case, the RAM office made three written submissions to the agency. Those written submissions are Excerpts of Record 106 to 109, 122 to 124, and the third one is attached as addendum E to our brief on appeal explaining what this interpretation is and how it was applied in this particular case. There was testimony from three people from the RAM office, including Phil Smith, the director of RAM, and two of his assistants. That testimony explains that what has been referred to in this record as the business rule was based upon an interpretation of the regulations. There is the email that plaintiffs referred to, certainly, and that sets out the substance of what that interpretation is. But it was an interpretation developed by the office that was charged with implementing these regulations. Now, I read the testimony about the business rule and so on, but that didn't tell me how they arrived at it. That just told me the business rule we put into the computer. And we got the business rule from the email. There is testimony... It's not without reasons. I understand that there are reasons, and you're recapitulating them now, but there was no formal process leading up to the email. It was an internal office decision. There does not need to be a formal process under the kind of Chevron deference that we are asking for. There does not need to be a formal process. The Auer case makes that clear. The Bowles v. Seminole Rock case makes that clear. But I think we're back to where you're saying that this email should get the same deference as the amicus brief and the other things in those cases. Well, it isn't just the email itself. This policy was applied consistently throughout this entire program to every single fisherman who applied for a permit. This policy... This one ticket, one harvest ticket. It was applied consistently throughout this entire program. It was the basis for deciding how this data received from the state. Do we have in the record any indication as to how many crabbers were disadvantaged by this one ticket, one harvest rule? We have one in front of us, obviously. Were there others? Do we know? I don't know that there's any information in this record that shows that definitively one way or another. What is certainly true is that the council, in making its deliberations, was making judgments about how many people to allow, how many fishermen, how many vessels to allow into the... Well, I've got no quarrel with the council. I mean, I take their regulation as there it is. The question is whether or not the one ticket, one harvest is an appropriate implementation of what the council did. I don't think that the change, the regulatory change that you have asked about has the consequence that you are ascribing to it. What does a fish ticket then document if not landing? A fish ticket... That is to say, if you say with respect to somebody who comes in having had two takes, I'm staying away from the word harvest. I won't stay away from the term of art. Two takes of the same species of crab, separated in time. They come in and all they get is one fish ticket and you say, well, all you get is one harvest. It seems to me that you are implementing precisely the previous rule rather than the other rule because you're not allowing in any evidence that this might be considered as two harvests. It's conclusive that the landing is all you get to talk about. I don't think that NIMS intended the change that the plaintiffs are ascribing to that regulatory change or that you are when that change was made. The preamble language says, in the final rule, the preamble language says, this is to more accurately reflect, more accurately describe what information we are interested in, what we want done. That's basically the sum and substance of what that says there. If you look at... Because what you've now ignored is one of the two harvests. I understand there is no line drawn through one of them. We haven't ignored the two harvests. What do you mean the two takes? All right. If the council, or excuse me, if NIMS was intending, this would be a very dramatic change from the way that this had previously been analyzed by the council. That's right, and they deliberately say, we've changed the wording. We're not doing landings anymore. We're doing harvests. But if you look at, for instance, there was a memo that the regional NIMS administrator sent to Washington headquarters, which was contemporaneous with this final rule, seeking approval for the final rule. And they... It's at Excerpts of Record, page 24, and the pertinent language is on page 25. This is the fourth paragraph down on page 25. This is a memo from Steve Penoyer, the regional administrator, to Roland Schmidt. And that paragraph starts out, it says, no major changes were made in the final rule due to comments received on the proposed rule. That last qualifier may be interesting. It doesn't say I didn't make any major changes. We didn't make any changes in response to comments. Of the few changes made, most were editorial. In addition to the editorial changes, there was the change in definition from documented harvest was added to the final rule. This term more accurately describes behavior necessary for eligibility. But this would have been, if it was interpreted the way that the plaintiffs are asking for, this would have been a hugely significant change. But pay attention to the language you just read to me. The first sentence says, no major changes were made in the final rule due to comments received on the proposed rule. This change was not made due to comments. We know that. Of the few changes that were made to the final rule, most were editorial changes designed. In addition to the editorial changes, okay, well, wait a minute. Maybe there were some important changes that are non-editorial. In addition to the editorial changes, the term documented harvest was added to the final rule. As I read that, that says, well, we didn't make any major changes in response to comments. We made a lot of editorial changes. And then we made this change, which is not in response to comment and is not an editorial change. We made the change to undocumented harvest. If there were a change that would have that consequence, there would have been a requirement to have significant analysis in this decision document as to what the impact of that change was going to be. Well, you know, I'm not sure that it's a major change. It's obviously a major change if this vote is right as to them. But we keep asking, well, how many other votes are going to be affected? And as far as we can tell, none. Or at least there's nothing in the record that says that any other vote was affected. That's because no one was proceeding on the assumption that, certainly NIPS was not proceeding on the assumption that the change of this regulatory term from legal landing to documented harvest was going to affect the way the council had analyzed this. That's what I'm getting at. The council talked about landings. You adopted the landing to be a fish ticket. Fish ticket is totally within the control of the process of the state. If they had put 15 of those different area harvests on one fish ticket, you would have accepted that, too. I don't think, am I right? You accepted the fish ticket. Whatever the state said on the fish ticket, you took it. And you said, give me three of those, whatever they say. Isn't that correct? No. No, that is not correct. That's what it is. It says three landings, and your interpretation of landing was, or documented harvest, was a fish ticket. If a fish ticket showed a landing of three separate species of fish in one federal endorsement area, that would be three documented harvests. So you examined the fish ticket for content. Yes. No, they don't examine the fish. But not one of the brown crab. They didn't examine the fish ticket. They examined the information that was given to them by the state of Alaska. The state of Alaska provided to NIMS, the state collects all this data and provides that to NIMS. And on the basis of that, NIMS creates the official LLP record. And what NIMS did was to look at each one of these and translated this around the state statistical area. It would translate that into what federal endorsement area or endorsement areas were these fish caught in. And if there was fishing in more than one federal endorsement area for the same species, that would count as two documented harvests. But, you know, if you look at the record and didn't... You didn't repeat that because I thought you just said, like, counsel. No. If there was fishing, I said if there was fishing in more than two federal endorsement areas, not state statistical areas. That's what Alaska Trojan is relying on. Are we talking now about fishing for fish or fishing for crab? It's the same either way. Where is the federal endorsement area in the record here? I missed that, too, then. Because I was assuming that you were looking at the state area. No, no. Where is the federal area described? It's in the regulations. In what regulations? It is in 50 CFR 679. Do we have it in the excerpts? Yes. Yes, it is. So the state areas and the federal areas are not synonymous and you could add more than one. They are absolutely not synonymous. And the fish ticket only gives you the basic knowledge to come up with three different federal endorsement areas. Correct. Yes. Let me... On page 41 of the excerpts of record... In the third column, the right-hand column, about halfway down, subcapital D, says Aleutian Islands Brown King. And this is the key regulation from which you have to start your analysis. And it says, in order to obtain what here is a Brown King crab endorsement for the Aleutian Islands area, which is what they were seeking, that they have to obtain at least three documented harvests of any amount of Brown King crab harvested in the area described in the definition for Aleutian Islands Brown King area species endorsement. That is a federally defined area. And is there any question in this case that all three of these takings, which they say are all harvests, were done in that geographical area? No, they were done in that geographical area. So that's not a question in this case? That's not a question. Okay. No. But the way that... What is the question? The question is then that they harvested in three areas, but they were all the same species? The question is that they have three documented harvests. That looks like a documentation to me. Right there on the ticket. The definition of documented harvest in the regulation says documented in compliance with state law. And did they violate state law? State law requires... No, they didn't violate state law, but it requires getting a fish ticket. But the fish ticket is one form of documentation. On the fish ticket is other documentation. You've decided for purposes of your interpretation of the regulation that a fish ticket is required to document a harvest when a fish ticket is synonymous with a landing. The regulation... A fish ticket is not always synonymous with a landing. When do you get a fish ticket if you don't do a landing? If you look at the state regulatory rule, which is reproduced in full in our brief, red brief, it's the very last attachment, the addendum F, the very last attachment. Okay, I'm with you. Where am I looking? All right. Sub A, or well, let's start with Sub C. What page am I on? Well, this is... It's the very first page of this attachment. It has page number two up in the upper right-hand corner. Okay. Sub C. Each buyer of raw fish, or each fisherman selling to a buyer, and each person or company who catches and processes his or her own catch, shall record each landing with a fish ticket. Right. That's what I understood. So the document, when the federal regulation defining documented harvest says you have to comply with state law, that means you have to get a fish ticket. Of course you have to get a fish ticket. But it doesn't say in the regulation, and the only document that will be accepted is a fish ticket, and the only way a fish ticket will be counted is one harvest per fish ticket. It doesn't say that. All right. For catcher-processor vessels, NIMS has a different rule as to how their catch would be counted for purposes of getting a documented harvest. Right. And that is that those vessels are required to file what are called weekly production reports. And NIMS decided that for purposes of those catcher-processor vessels, their documented harvest would be based upon filing each one of those weekly production reports. That's not associated with a landing. I understand that. And that's part of my point of saying you've chosen for this purpose, for crab, to require a fish ticket which comes with a landing, making it very clear that you do not regard the regulations that says harvest always to require a fish ticket or a landing. In this case, for crab, you do. Yes. Okay. Thank you. I'm taking you way over. Go. Judge Bernande, I want to respond to your comment about what the council looked at. This rule that we're talking about here, this business rule, this one fish ticket equals one documented harvest rule, that was not a rule. That's not a council rule. It's not something the council generated. It's not something that the council considered. The database that was before the council was the state fish ticket file. And the state fish ticket file, like the official record, separately identifies and documents these takings according to the statistical area in which they were caught. And so the council, when they analyzed the LLP and made their projections of what the harvest was, it was based on a data set that had already split these out. The rule, this rule that Rand came up with, that came along much later. So for the council's purpose, and the council never said three fish tickets. The council said, well, three landings. But again, you have to think about, well, what was the context in which they were thinking about that? They were thinking about it in terms of the database in which these were separate. Separate on that data they were looking at. Are those equated to one or two fish tickets at all, or just the raw data that came off the fish ticket? Well, of course, the state fish ticket file, as you might imagine, is huge, because you have hundreds of fishermen delivering. So what they had is a computer program that then they extracted certain conclusions from. And in fact, if you look at, I believe it's, for instance, excerpt of record page 20, there's kind of an example there of the kind of conclusion that they drew from the record. So they were, you know, they did certain data runs, and they came up with projections about how many vessels would participate. But it was based upon a record in which these were separated. Again, the council members had fish tickets. The council said three landings, because, you know, they were thinking in terms of what the database was that was before them. Wait a minute. You said the council said three landings. Well, then they changed to say three harvests. Nymphs changed. And in fact, in response to your honest question about the nature of the change, if you look at ER 33. So the council said landings. Nymphs in the regulation says no harvest reflects that more accurately. And Nymphs described it as a substantive change, a substantive change from the proposed rule and from the concept of a landing, because, of course, they have definitions of landing. And so they were trying to make sure that they didn't get balled up and that they were clear on what they meant. I think the final point I want to make is that it's important to keep, again, the context here of how determinations of eligibility were to be made. They were to be made on the record. I mean, that's what the LLP regulations say. The LLP regulations say you look to the record to make a determination, and if the record is incorrect, you have to correct the record, and then you will use it. I mean, we've quoted those regulations in our brief. And what we're saying is that if you look to the record, you see that these are distinct separate harvests and that they ought to be counted as such as what the plain definition of documented harvest is, which is a lawful harvest recorded in compliance with state regulations. I see my time is up. Thank you very much. Your Honor, I just beg your indulgence. Well, two procedural, quick procedural points. Council mentioned that, you know, there is this subsequent program that has come into effect. I didn't know if that was the kind of thing that ought to be addressed in the 28J letter. If Your Honors want us to give you that site, we can do it, or I can just give it to you now. I'm not sure what bearing it has on this case. It does not except for the fact that we mentioned it in our pleadings. And the second thing is just to also advise you so you're aware of what's happening. When that new program went into effect, it changed the ability of this vessel to go fishing. The season starts on August 15th. We went to the district court and requested an injunction pending appeal. As I understand, Federal Appellate Rule 8 requires you to go to the district court first before you approach this court. That motion was briefed. It's under advisement to district court. It's been there about a month. At some point, the district court will rule or not. And I don't know. We haven't yet decided if we're going to approach this court with a motion. I understand there's the issue about, well, does it go to the motions panel? Does it go to the merits panel? I'm not saying weighing in on that at all. I'm just alerting you to the fact that there could be a motion for injunction pending appeal. And this is a result of the fact it's a new program because this boat does not have a permit. The new program frees it out, so then you have to get the injunction of district court pending our decision because if you get a permit out of us, then you get the new program. If we get a permit out of you, we get into the new program. If we don't get the endorsement, we're out. Then it does affect your case because we may get it with the injunction. Well, it affects the case. The new program affects the case in the sense that it's changed the facts on the ground as far as the fishery is going to start on August 18th. The question of whether or not they get this endorsement is still the issue that's before you. It's just that the consequences of that decision are now a little different than what they were when we briefed the case. Thank you very much. It's a very well-briefed and very well-argued case on both sides. Thank you very much. The case of Alaska-Trojan Partnership v. Gutierrez is now submitted for decision. That concludes our oral argument calendar for today and for the week. And although there are not very many people here in the room to accept our thanks, thank all of you for a very hospitable week in Anchorage. Thank you. All rise. The support for this session stands adjourned. Thank you. Thank you.
judges: Goodwin, Brunetti, W. Fletcher